UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| IBRAHIM QASIM and NOUH QASIM,<br><br>    Plaintiffs,<br><br>    v.<br><br>SPECTRUM BRANDS HOLDINGS, INC., *et al.*,<br><br>    Defendants. | Civil Action No. 21-18744 (JXN)(JRA)<br><br>**OPINION** |

**NEALS**, District Judge

Before the Court is Defendants Spectrum Brands Holdings, Inc. ("Spectrum"), United Industries Corporation ("United"), Liquid Fence Company, and The Home Depot, Inc.'s ("Home Depot") (collectively, "Defendants") motion to exclude the opinions and testimony of Dr. James Pugh, Ph.D., P.E. ("Dr. Pugh") pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals., Inc.*, 509 U.S. 579, 589–95 (1993). (ECF No. 42.) Plaintiffs Ibrahim Qasim ("Ibrahim"[1]) and Nouh Qasim ("Nouh") (collectively, "Plaintiffs") opposed (ECF No. 45), and Defendants replied (ECF No. 46). The Court held a *Daubert* hearing (ECF No. 110), and the parties submitted supplemental briefs (ECF Nos. 109, 111). For the reasons set forth below, Defendants' motion to exclude Dr. Pugh's testimony is **GRANTED**.

I.   **BACKGROUND**

   A.   **Statement of Facts**

The parties are familiar with the facts, so the Court recounts them briefly. Ibrahim bought a sixty-four-ounce container of EcoLogic Bed Bug Killer 2 ("Product") from Home Depot on

---

[1] Because Plaintiffs share the same last name, the Court refers to them individually by their first names.

August 26, 2019.[2] (Defs.' Statement of Undisputed Material Facts ("SUMF") ¶ 1, ECF No. 42-12.) On September 2, 2019, at 9:00 a.m., Ibrahim sprayed all sixty-four ounces of the Product into the living room of the apartment he and Nouh shared. (*Id.* ¶¶ 16–18.) At 5:00 p.m., as Nouh turned on the gas stove in the kitchen to make coffee, a fireball erupted, severely burning both Plaintiffs.[3] (*Id.* ¶ 19.) The Newark Fire Department found sodium azide in the bathtub drain, a highly toxic chemical compound "used to make explosives and methamphetamine."[4] (*Id.* ¶ 24.) First responders also found a gasoline can in the apartment.[5] (*Id.* ¶ 25.)

### B. Procedural History

In August 2021, Plaintiffs sued Defendants in New Jersey Superior Court for (i) Strict Products Liability: Design Defect (Count One), (ii) Strict Products Liability: Failure to Warn (Count Two), (3) Negligence (Count Three), and (4) Violations of the Consumer Fraud Act ("CFA") (Count Four). (*See* Compl, ECF No. 1-1.) Defendants timely removed to this Court.[6] (*See* Notice of Removal, ECF No. 1.)

---

[2] United designed, labeled, and packaged the Product.[2] (*Id.* ¶ 10.) Spectrum, a holding company, indirectly owns United. (*See* Defs.' SUMF at 1 n.1.)

[3] As explained in its summary judgment Opinion, the Court accepted this fact as unrebutted because Plaintiffs failed to cite any record evidence to the contrary. *Qasim v. Spectrum Brands Holdings, Inc.*, No. 21-18744, 2024 WL 4345153, at *1 n.4 (D.N.J. Sept. 30, 2024).

[4] In Plaintiffs' statement of undisputed material facts, Plaintiffs assert the Newark Fire Department's statement is inadmissible hearsay. (*See* Pls.' Statement of Undisputed Material Facts ("SUMF") ¶ 24, ECF No. 45-2.) To be sure, a party "may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). But "this must be done in a brief. The statement of material facts is not the vehicle for conveying these points." *Teubert v. SRA Int'l, Inc.*, 192 F. Supp. 3d 569, 576 (D.N.J. 2016). Because Plaintiffs do not make this argument in their brief, the Court considers the Newark Fire Department's statement undisputed for purposes of this motion. *Id.*

[5] As before, Plaintiffs' statement of undisputed material facts asserts the first responders' statement is inadmissible hearsay. (Pls.' SUMF ¶ 25.) And again, the statement of material facts is not the place to make this argument. *Teubert*, 192 F. Supp. 3d at 576.

[6] The Court notes it has jurisdiction. Under 28 U.S.C. § 1332, a federal court has jurisdiction over an action where (a) no plaintiff is a citizen of the same state as any defendant, and (b) the amount in controversy exceeds $75,000. *Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412 (3d Cir. 2010). A corporation is a citizen of both its state of incorporation and where it principally does business. *Id.* (citing 28 U.S.C. § 1332(c)). Plaintiffs are New Jersey residents; Spectrum, United, and Home Depot are Delaware corporations principally doing business in Wisconsin, Missouri, and Georgia, respectively; Legal Fence is not a legal entity separate from United. (Notice of Removal at 2–3.) So, the parties are

Plaintiffs retained Dr. Pugh as an expert, who summarized his analysis in a two-page report ("Pugh Report"). (*See* Defs.' SUMF ¶ 27; Pugh Report, ECF No. 42-11.) Dr. Pugh bought a fourteen-ounce aerosol can of the Product as an "exemplar" of the container Ibrahim used. (Pugh Report at *4.[7]) To render his conclusions, Dr. Pugh examined: (i) "the photographs of the container of [the Product] used by . . . [P]laintiffs"; (ii) the exemplar can; (iii) "the Safety Data Sheet for [the Product]"; (iv) "the specifications for Sodium Azide"; and (v) "the specifications for Sodium Benzoate, one of the components of the [Product]." (*Id.*) Dr. Pugh explained:

> The Safety Data Sheet for the [Product] indicates that it is flammable and must not be used in the presence of heat or open flame. The [exemplar] can of [the Product] lists sodium benzoate as a component, and in very small print, necessitating a magnifying glass, "Do not use or store near heat or open flame." There was none of the three hazard pictograms, nor signal words, nor adequate hazard statements on the can itself, all of which are mandated by the Safety Data Sheet, and as mandated by the ANSI Z35 and Z535 series of standards. Further, there was no information as to how long to wait prior to exposing treated areas to an open flame such as a cigarette lighter, a match, or a gas-range.
>
> Further, the container of [P]roduct used in the accident has the verbiage "Safe Around Children & Pets" with an associated pictogram showing a child and a pet prominently present on the front of the container and as the first and topmost alerting instruction provided. The presence of wording, and pictogram all are misleading and necessarily create an illusion of safety in the use of the product, and is dissuasive of a user proceeding further in the reading of the instructions, particularly in the absence of additional pictograms such as the open flame pictogram. . . .
>
> Further, in addition[ ] to the aerosol product being flammable in and of itself, sodium benzoate, one of the components of the [Product], dries to a white dusty powder, which is explosive in nature.

(*Id.* at *4–5.) After recounting Plaintiffs' telling of the events, Dr. Pugh,

---

completely diverse. And, while Plaintiffs do not specify the amount of damages sought, the severity of their injuries indicates such an amount likely exceed $75,000. *See Morrison v. Spirit Airlines, Inc.*, No. 19-18743, 2019 WL 6907481, at *3 (D.N.J. Dec. 17, 2019) (noting amount in controversy appeared to exceed $75,000 where plaintiff alleged sustaining serious and permanent injuries).

[7] Pincites preceded by an asterisk (*) refer to CM/ECF pagination.

> concluded, to a reasonable degree of scientific, engineering, ergonomic, and human factors certainty, that the defective labeling of the product was the proximate cause of the accident. Had an open flame pictogram been prominently displayed as the child and pet pictogram was displayed, the plaintiff would have noticed that the product was flammable and would not have taken necessary precautions to avoid ignition of the product.

(*Id.* at *5.)

In October 2023, Defendants moved for summary judgment and to exclude Dr. Pugh's expert report under Federal Rule of Evidence 702. (*See* Defs.' Moving Br., ECF No. 42-1.) Defendants argued Dr. Pugh's expert report should be excluded because it concluded the warning label on the Product caused the fire without "any mention of scientific methodologies, mathematical calculations, or independent testing and analysis." (*Id.* at 14–15.) Specifically, Defendants claimed Dr. Pugh did not perform any testing or analysis to determine: (a) the cause or origin of the fire; (b) "whether chemical components of the Product (e.g., sodium benzoate or isopropyl alcohol) . . . could have concentrated near the ignition source of the stove to cause a fire"; or (c) "how any vapor from the Product that was applied in the living room and evaporated into the air could have migrated toward the kitchen." (*Id.* at 15.) Plaintiffs opposed (Pls.' Opp'n, ECF No. 45-1) and Defendants replied (Defs.' Reply, ECF No. 46).

The Court granted Defendants' motion in part. *See Qasim*, 2024 WL 4345153, at *1–6. The Court dismissed Counts One, Three, and Four with prejudice, *id.* at *3–4, and dismissed all claims against Home Depot, *id.* at *5–6. As for Count Two, the Court concluded a *Daubert* hearing was necessary before it could resolve the motion. *Id.* at *4. Accordingly, the Court denied the summary judgment motion without prejudice as to Plaintiffs' failure to warn claim. *Id.*

The Court held a *Daubert* hearing on October 6, 2025. (*See* Hearing Tr., ECF No. 110.) At the hearing, Defendants argued: (1) Dr. Pugh was not qualified to offer an opinion about the cause and origin of the fire; (2) Dr. Pugh's opinion about the cause of the fire was not relevant because

4

it did not address how the warning on the Product led to the fire; and (3) Dr. Pugh's methods were unreliable because he did not conduct any testing to show how Plaintiffs' suggested flammability pictogram would have been more adequate, and failed to rule out other possible causes of the fire. (*Id.* at 14:22–17:15.)

Dr. Pugh testified at the *Daubert* hearing. (*See generally id.*) Dr. Pugh explained he earned an undergraduate degree in engineering and a Ph.D. in biomedical engineering from the Massachusetts Institute of Technology ("MIT"). (*Id.* at 26:1–5.) While a graduate student at MIT, Dr. Pugh worked at the U.S. Army Materials and Mechanics Research Lab. (*Id.* at 25:21–23.) After graduating, Dr. Pugh taught biomechanics, engineering, and materials sciences at several institutions, including New York University. (*Id.* at 26:16–27:8.) Dr. Pugh testified he had "been frequently called on to analyze products, warnings, and instructions, particularly with regard to motor vehicle vehicles . . . and how the operators manual can be improved significantly to draw people's attention to certain aspects of a motor vehicle." (*Id.* at 23:19–24:1.) Dr. Pugh stated he also did "work with the U.S. Postal Service with regard to improving their employee safety with guidance with signage and the like." (*Id.* at 24:2–8.) Dr. Pugh averred he did "a lot of thermal injuries analysis, particularly electrical with regard to short circuits, electrocutions, arcing of networks that have caused injuries." (*Id.* at 24:20–22.)

Dr. Pugh opined the Product's 12% isopropyl alcohol content caused the fire, as the blaze "was totally consistent with an isopropyl alcohol fire." (*Id.* at 31:9–11.) Dr. Pugh explained he was qualified to conclude that isopropyl alcohol caused the fire because:

> I have a large amount of experience with alcohol, isopropyl alcohol fires. I am a sailor. I had a sail boat that had an alcohol stove, isopropyl stove, for a number of years that I would work with. And I am very aware of certain features of isopropyl alcohol fires that people aren't aware of.

(*Id.* at 30:16–22.) On cross-examination, however, Dr. Pugh acknowledged he "didn't do any experiments" to assess if isopropyl alcohol could cause a fire based on how Plaintiffs used the product. (*Id.* at 59:1–3.) Dr. Pugh also noted he did not create any experimental model to analyze the Product's flammability. (*Id.* at 81:20–24.) Moreover, Dr. Pugh conceded he did not conduct any testing or analysis to determine how long it would take for the Product's flammable components to dissipate. (*Id.* at 77:20–78:5.)

Dr. Pugh testified he was not a certified fire investigator, a member of the International Association of Arson Investigators, the National Association of Fire Investigators, or the National Fire Protection Association. (*Id.* at 59:18–60:19.) Nor had Dr. Pugh published any articles about the adequacy of pesticide warnings or isopropyl alcohol fires. (*Id.* at 65:1–23.) Dr. Pugh acknowledged he examined a different container of the Product—Ibrahim used a sixty-four-ounce hand pump bottle of the Product; Dr. Pugh examined a fourteen-ounce aerosolized spray can. (*Id.* at 69:16–70:19.)

Dr. Pugh explained he did not conduct any experimental testing to rule out other possible causes of the fire. Though a can of gasoline was found in the apartment, Dr. Pugh ruled out gasoline as a cause without any experimental testing. (*Id.* at 75:4–19, 76:5–12.) Likewise, although the bathroom had traces of sodium azide, an explosive substance, Dr. Pugh ruled that out as a cause of the fire because the fire started in the kitchen. (*Id.* at 34:22–25.)

Dr. Pugh concluded the Product's warning label "was defective and deficient" because it

> was not alerting, sufficiently alerting to a user, that the product, which contains 12[%] isopropyl alcohol, which is highly flammable, and is highly flammable even when mixed with other ingredients, including water to dilutions as low as one or two percent. That it does not indicate to a user adequately the flammable nature of the product and the fact that it should not be used near an ignition source. The ignition source being such as a Piezo electric ignitor on a stove, a gas stove as an expert.

6

(*Id.* at 29:24–30:10.) Because the Product contained flammable isopropyl alcohol, Dr. Pugh concluded the container should have "included an open flame pictogram." (*Id.* at 52:12–13.) However, Dr. Pugh stated he did not test his proposed pictogram on any focus group or consumers. (*Id.* at 74:3–19.) And Dr. Pugh acknowledged he could not say "within a level of certainty" that Ibrahim would have used the Product differently if it had had a pictogram. (*Id.* at 71:15–16.)

Following the *Daubert* hearing, the parties submitted supplemental briefs. (Pls.' Supp. Br., ECF No. 109; Defs.' Supp. Br., ECF No. 111.)

## II. LEGAL STANDARD

Under Federal Rule of Evidence 702, a witness qualified as an expert may provide expert testimony if: (a) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"; (b) "the testimony is based on sufficient facts or data"; (c) "the testimony is the product of reliable principles and methods"; and (d) "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. Federal Rule of Evidence 702 thus imposes "three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit." *Cohen v. Cohen*, 125 F.4th 454, 460 (3d Cir. 2025) (quoting *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000)).

"[T]rial courts must perform a gatekeeping function to ensure the relevance and reliability of expert testimony." *In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Prods. Litig.*, 509 F. Supp. 3d 116, 130 (D.N.J. 2020). "In conducting this analysis, courts are to consider 'all aspects of the expert's testing: the methodology, the facts underlying the expert's opinion, [and] the link between the facts and the conclusion.'" *Id.* at 131 (quoting *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 291–92 (3d Cir. 2012)). "Moreover, courts must ensure that expert

testimony reflects accepted standards within the relevant scientific and business communities." *Id.* "The party proposing the expert testimony must show that each prong is satisfied by a preponderance of the evidence." *Fabricant v. Intamin Amusement Rides Int. Corp. Est.*, No. 19-12900, 2025 WL 1823143, at *11 (D.N.J. July 2, 2025) (quoting *Oddi v. Ford Motor Co.*, 234 F.3d 136, 144 (3d Cir. 2000)).

### III. DISCUSSION

#### A. Qualification

A witness "must be qualified to testify as an expert." *Ford v. Ford Motor Co.*, 311 F. Supp. 3d 667, 673 (D.N.J. 2017) (quoting *Calhoun v. Yamaha Motor Corp.*, 350 F.3d 316, 321 (3d Cir. 2003)). This is a low bar. *In re Paoli R.R. Yard PCB Litig.* ("*Paoli II*"), 35 F.3d 717, 741 (3d Cir. 1994). An expert need only "possess[] specialized expertise." *In re Hum. Tissue Prods. Liab. Litig.*, 582 F. Supp. 2d 644, 655 (D.N.J. 2008) (quoting *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008)). Specialized expertise is "skill or knowledge greater than the average layman." *Aloe Coal Co. v. Clark Equip. Co.*, 816 F.2d 110, 114 (3d Cir. 1987). "[A] broad range of knowledge, skills, and training qualify an expert as such," *Paoli II*, 35 F.3d at 741, including "practical experience as well as academic training and credentials." *Daiichi Pharm. Co., Ltd v. Apotex, Inc.*, No. 03-937, 2005 WL 7979497, at *2 (D.N.J. Nov. 1, 2005) (quoting *Elcock*, 233 F.3d at 741). "The criteria required to qualify an expert turn largely upon the subject matter of the opinion to be offered." *Silipena v. Am. Pulverizer Co.*, No. 16-711, 2024 WL 3219226, at *10 (D.N.J. June 28, 2024) (quoting *Kerrigan v. Maxon Ind.*, 223 F. Supp. 2d 626, 635 (E.D. Pa. 2002)). "If the expert meets liberal minimum qualifications, then the level of the expert's expertise goes to credibility and weight, not admissibility." *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 809 (3d Cir. 1997). "[I]t is an abuse of discretion to exclude testimony simply because the

8

trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate." *Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 782 (3d Cir. 1996).

Here, Dr. Pugh opined about the Product's warning label and the cause of the fire. Dr. Pugh has extensive experience analyzing "products, warnings, and instructions." (Hearing Tr. at 23:19–24:1.) So, he has more knowledge than the average layperson about the adequacy of warnings. Dr. Pugh, therefore, is qualified to opine about the Product's warning label.

Dr. Pugh, however, is not qualified to testify about the cause of the fire. To be sure, Dr. Pugh testified he had "done a lot of thermal injuries analysis" and was "exposed to a large amount of fire and thermal events" in his work at MIT. (*Id.* at 24:20–25:14.) But analyzing burns on the human body or seeing fires in a ballistics laboratory are fundamentally different than investigating the origin of a fire. Dr. Pugh has never been a fire investigator, been a member of a professional fire investigation organization, or published an article on the causes of fires. (*Id.* at 59:18–60:19, 65:1–23. *See also* Pugh Report at *7–34.) Dr. Pugh has no training in recognizing burn patterns. (*Id.* at 49:11–15.) And the record does not reflect he has any practical experience investigating the origin of a fire. Instead, Dr. Pugh's sole experience with fire causation comes from owning a sailboat with an isopropyl alcohol stove, (*id.* at 30:18–19), and taking courses at MIT covering isopropyl alcohol fires, (*id.* at 48:24–49:3.) But the fact that Dr. Pugh knows what an alcohol fire looks like in a stove on a boat does not qualify him to give an expert opinion that *this* fire was an alcohol fire, or the Product caused it. *See Yazujian v. PetSmart*, 729 F. App'x 213, 216 (3d Cir. 2018) (excluding retail safety expert whose sole experience was "based on his review of over one hundred retail store manuals, and . . . visits to retail stores where he would walk in and look around."); *United States v. Keszey*, 643 F. App'x 153, 158 (3d Cir. 2016) (excluding snake bite

9

expert who had "had little, if any, training in herpetology and minimal academic exposure to the subject."); *Aloe Coal Co.*, 816 F.2d at 114–15 (holding tractor salesman unqualified to testify about cause of tractor fire); *United States v. Nyce*, No. 20-063, 2022 WL 1214171, at *4 (E.D. Pa. Apr. 25, 2022) ("And while [defendant's experts] may have some experience in breeding animals, nothing in their biographies suggests that they are qualified—or even able, as a veterinarian would be—to similarly interpret [veterinary medical] records."); *Travelers Prop. Cas. Ins. Co. v. R-Tek Insulation, Inc.*, 673 F. Supp. 3d 879, 885 (N.D. Ohio 2023) ("The fact that [an expert] possesses knowledge of how a fire *might theoretically* be started by the heat from a non-IC rated canister light in no way qualifies him to give an expert opinion on the cause or origin of the fire in this case."). Accordingly, while Dr. Pugh is qualified to testify about warning labels, he is not qualified to testify about the cause of the fire.

**B.     Reliability**

Expert testimony must be reliable. *Daubert*, 509 U.S. at 590–91. Reliable testimony is "based on the methods and procedures of science, not on subjective belief and unsupported speculation." *Cohen*, 125 F.4th at 461–62 (quoting *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 80–81 (3d Cir. 2017)). "This inquiry 'applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, [and] the link between the facts and the conclusion.'" *Id.* at 462 (alteration in original) (quoting *ZF Meritor*, 696 F.3d at 291). The question is not "whether a particular scientific opinion has the best foundation, or even whether the opinion is supported by the best methodology or unassailable research." *Id.* (quoting *Karlo*, 849 F.3d at 81). "Instead, the [C]ourt looks to whether the expert's testimony is supported by 'good grounds.'" *Karlo*, 849 F.3d at 81 (quoting *In re TMI Litig.*, 193 F.3d 613, 665 (3d Cir. 1999)). Good grounds include:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Id.* (quoting *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 834 (3d Cir. 2020)). But "these factors are neither exhaustive nor applicable in every case." *Kannankeril*, 128 F.3d at 806–07. Though no single factor "is dispositive, some analysis of these factors is necessary." *UGI Sunbury LLC*, 949 F.3d at 834. And the Court has "'broad latitude' in determining how to assess the reliability of an expert opinion." *Tyger v. Precision Drilling Corp.*, 832 F. App'x 108, 112 (3d Cir. 2020) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141–42 (1999)). But while *Daubert* does not require "a paradigm of scientific inquiry," it demands "more than [a] haphazard, intuitive inquiry." *Oddi*, 234 F.3d at 156. "[A]n expert opinion overly reliant on assumptions absent 'sufficient factual predicates' is a 'castle made of sand.'" *Tyger*, 832 F. App'x at 113 (quoting *Elcock*, 233 F.3d at 755).

      i.    *Fire Causation*

Dr. Pugh's opinion about the cause of the fire lacks good grounds because it is based entirely on comparing pictures of the apartment to his experience using an alcohol stove on a boat. "Although there may be some circumstances where one's training and experience will provide an adequate foundation to admit an opinion and furnish the necessary reliability to allow a jury to consider it, this is not such a case." *Oddi*, 234 F.3d at 158. Dr. Pugh did not test the Product or account for the distance between where Ibrahim sprayed the Product and the site of the fire, the time between when Ibrahim sprayed the Product and the fire, or the presence of other flammable substances in the apartment. He "used little, if any, methodology beyond his own intuition." *Id.*

11

"There is nothing here to submit to peer review, and it is impossible to ascertain any rate of error for [Dr. Pugh's] assumptions about the [cause of the fire]." *Id.* "Similarly, no standards control his analysis, and no 'gatekeeper' can assess the relationship of [Dr. Pugh's] method to other methods known to be reliable and the non-judicial uses to which it has been put." *Id.* In short, Dr. Pugh had no reliable basis to conclude the Product's isopropyl alcohol content caused the fire. *See, e.g.*, *Fabricant*, 2025 WL 1823143, at *15 (excluding roller coaster design expert who "simply compared photographs of rollercoasters he found on the internet to the Kingda Ka photograph taken by Plaintiffs in this case."); *Furlan v. Schindler Elevator Corp.*, 516 F. App'x 201, 206 (3d Cir. 2013) (excluding liability expert whose opinion was based solely on amateur photograph and fact that accident occurred).

    ii.  *Failure to Warn*

Courts in this District "look to the following non-exclusive indicia of reliability" in product liability cases:

> whether the expert considered (1) federal design and performance standards, (2) standards established by independent standards organizations, (3) relevant literature, (4) evidence of industry practice, (5) product design and accident history, (6) illustrative charts and diagrams, (7) data from scientific testing, (8) the feasibility of any suggested modification, and (9) the risk-utility of any suggested modification.

*Ebenhoech v. Koppers Indus., Inc.*, 239 F. Supp. 2d 455, 467 (D.N.J. 2002) (quoting *Milanowicz v. Raymond Corp.*, 148 F. Supp. 2d 525, 533–34 (D.N.J. 2001)).

Dr. Pugh's conclusions about the Product's warning label lack signs of reliability. Here, the Product *had* a flammability warning. (*See* Pugh Report at *4.) Examining a fourteen-ounce spray can of the Product, Dr. Pugh concluded the text was too small. However, it does not appear he examined the warning on the much larger sixty-four-ounce container of the Product Ibrahim used on the day of the accident. (*Id.* at *4–5; Hearing Tr. 70:1–13.) "[E]xpert testimony which

12

concludes that warnings are 'deficient in placement, design, orientation, and content' is unreliable if the expert . . . has not read the warnings which were present on the product . . . ." *Ebenhoech*, 239 F. Supp. 2d at 468 (quoting *Jaurequi v. Carter Mfg. Co.*, 173 F.3d 1076, 1084 (8th Cir.1999)).

In any event, Dr. Pugh did not consider federal pesticide labeling standards, industry practice, the Product's accident history, scientific testing, whether his proposed open flame pictogram was feasible, or whether it would have prevented the accident. (*See* Pugh Report.) Nor did he provide any visual aids to explain his conclusion that the Product had an inadequate warning and that his proposed warning was adequate. (*Id.*) At most, Dr. Pugh asserts the Product's warning did not comply with two standards from the American National Standards Institute ("ANSI") and a warning handbook from 2006. (*Id.*) "However, [Dr. Pugh] does not discuss what these sources say nor how they informed his analysis. Nor does he attach the relevant excerpts as exhibits." *Milanowicz*, 148 F. Supp. 2d at 541. Dr. Pugh's "unexplained citations to design and performance standards do not show that his opinion is reliable." *Ebenhoech*, 239 F. Supp. 2d at 46. So, neither Dr. Pugh's opinion that the Product caused the fire, nor his opinion that the flammability warning on the Product was inadequate, are reliable.

    **C.**    **Fit**

"An expert's testimony 'fits' the proceedings, if it 'will help the trier of fact to understand the evidence or to determine a fact in issue.'" *Cohen*, 125 F.4th at 464 (quoting Fed. R. Evid. 702(a)). Fit "goes primarily to relevance." *Id.* (quoting *Karlo*, 849 F.3d at 81). An expert's "bare conclusions are not admissible under [the fit requirement] of Rule 702 of the Federal Rules of Evidence." *Snead v. Casino*, 700 F. Supp. 3d 203, 216 (D.N.J. 2023) (alteration in original) (quoting *H.M. ex rel. B.M. v. Haddon Heights Bd. of Educ.*, 822 F. Supp. 2d 439, 448 (D.N.J. 2011)). Such an opinion is "of no assistance to the trier of fact." *Silipena*, 2024 WL 3219226, at

13

\*14 (D.N.J. June 28, 2024) (quoting *Tannock v. N.J. Bell*, 223 N.J. Super. 1, 7 (N.J. Super. App. Div. 1988)). Rather, an expert must give the "'why and wherefore" underlying their opinion. *Snead*, 700 F. Supp. 3d at 216 (quoting *Iudici v. Camisa*, No. 12-3466, 2022 WL 3998295 (D.N.J. Sept. 1, 2022)).

Dr. Pugh's analysis is bereft of a why or wherefore. For instance, Ibrahim stated he used the Product around 9:00 A.M., and the fire occurred around 5:00 P.M. (Hearing Tr. 76:25–77:6.) At the *Daubert* hearing, Dr. Pugh testified it was "unlikely" the Product caused the fire if Ibrahim's timeline were true. (Hearing Tr. 77:7–14.) Dr. Pugh added he "disagree[d] with the characterization of the time that Ibrahim applied it in view of what [Nouh] said." (*Id.* at 77:14–16.) But Dr. Pugh did not explain *why* he disagreed with Ibrahim's account and believed Nouh's. (*See generally id.*) Nor did he address the issue in his report. (*See* Pugh Report.) Instead, he simply concluded the fire started when Nouh said it did. (*Id.*) That is of no assistance to the factfinder. *See Faragalla v. Otundo*, 626 F. Supp. 3d 783, 788 (D.N.J. 2022) (holding expert's opinion lacked "sufficient factual foundation" where it was "solely derived from [plaintiff's] representations."). Likewise, although Ibrahim testified "he never read the warnings or instructions on the [P]roduct" before using it (Hearing Tr. 68:15–18), Dr. Pugh concluded an open flame pictogram would have prevented the fire (*see* Pugh Report). Dr. Pugh entirely failed to explain why a plaintiff who did not read any of the warnings on the Product would nonetheless read a different warning on the Product. Here, too, the lack of a why or wherefore does not assist the factfinder. Dr. Pugh's opinions, accordingly, do not fit the proceedings.

Because Dr. Pugh is not qualified to render expert opinions on fire causation, his conclusions on fire causation and adequate warnings are unreliable, and his analysis does not fit the proceedings, his testimony must be excluded.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion to exclude Dr. Pugh's testimony (ECF No. 42) is **GRANTED**. An appropriate Order accompanies this Opinion.

**DATED:** 1/12/2026

                                                HONORABLE JULIEN XAVIER NEALS
                                                United States District Judge